PAMELA J. PITTINGTON, )
)
    Plaintiff, )
)
v. ) No.: 3:14-CV-466-PLR-CCS
)
GREAT SMOKY MOUNTAIN )
LUMBERJACK FEUD, LLC, )
)
    Defendant. )

# MEMORANDUM OPINION

Plaintiff Pam Pittington brings this action against her former employer, the Great Smoky Mountain Lumberjack Feud, LLC (LJF) alleging LJF retaliated against her for filing a charge of sexual harassment against a member of management of LJF, resulting in her being constructively discharged. LJF, on the other hand, asserts that Pittington failed to report for work as scheduled and abandoned her job with LJF. Presently before the court are the parties' cross-motions for summary judgment [R. 13, 15].

## I. Positions of the Parties

**A.**     **Plaintiff's Position**

Pittington claims that LJF retaliated against her for bringing a sexual harassment claim. Specifically, Pittington alleges that she was demoted, stripped of managerial duties, and placed in a position with reduced job responsibilities because of her sexual harassment claim. Pittington also claims that she was ultimately fired, or, in the

alternative, constructively discharged in retaliation for bringing the sexual harassment claim. Pittington brings her claims under Title VII and the Tennessee Human Rights Act (THRA).

B. **Defendant's Position**

Defendant acknowledges that Pittington was employed by LJF and that she reported she was sexually harassed and sexually assaulted by a supervisor at work. As a result of its internal investigation into Pittington's claim, LJF initially suspended and ultimately terminated the supervisor. During its investigation, LJF learned of allegations of inappropriate behavior by Pittington in the workplace which had become a topic of conversation among her co-workers. LJF determined that it was best to transfer Pittington out of her position in the arena to a different department (the box office), where she would receive training to move into a management position. Pittington would also continue to work as assistant arena manager on the arena manager's days off. Pittington began working in the box office on September 28, 2012.

As the investigation proceeded, LJF learned of additional allegations of inappropriate conduct by Pittington. Based on this information, LJF decided to remove Pittington from assistant arena manager duties and have her work exclusively in the box office with the intent to train her to assume a different managerial position. LJF prepared a written notice dated October 8, 2012, and intended to present it to Pittington when she reported for her shift that day. However, she did not report for her shift on October 8, 2012, and failed to follow company procedure to give advance notice when missing a scheduled work shift. Pittington also did not work her scheduled shift on October 9,

2

2012, due to a sick child, but failed to provide the required notice to her supervisor. When she reported for her shift on October 10, 2012, she received a written warning for these failures and was verbally notified of LJF's decision for her to work exclusively in the box office. LJF assured Pittington that it considered her a valued employee and desired for her employment to continue. Pittington finished her shift, but never again reported for any of her scheduled shifts after October 10, 2012. As a result, LJF considered Pittington's employment voluntarily terminated.

## II. Background

LJF operates a dinner show theater in Pigeon Forge, Tennessee. The show is comprised of various lumberjack competitions involving ESPN lumberjack athletes. Guests may purchase tickets for the show only or for the show and dinner. LJF also offers guests the opportunity to purchase souvenirs and DVD recordings of the show.

Pittington and her husband, David, were hired by LJF in June 2012. Pittington worked in both concessions and in the arena, depending on the personnel needs of the particular day. Pittington's supervisor, William Mapp, chose Pittington to act as "assistant arena manager" on Mapp's days off. Pittington received a higher hourly rate of pay for the hours acting as assistant arena manager.

On September 13 or 14, David Pittington reported to Mike Downs, LJF's Facilities Manager, that another manager, Rich Mace, was making rude sexual comments to his wife. David told Downs that he had discussed his concerns with Rob Scheer, LJF's Managing Partner, and that they were going to meet upon Scheer's return to Tennessee from Alaska. Downs did not take any immediate action on David's concerns.

3

On Friday, September 14, 2012, Pam Pittington spoke with Mapp and informed him that she had been sexually harassed by Mace. She told Mapp that Mace had been texting her and asking her to come to his office after work. She also told him that one night, Mace asked her to come to his office in the audio/visual booth after the show. When Pittington went into the office, Mace shut the door and attempted to kiss her.

Mapp did not notify Scheer of Pittington's sexual harassment claim until the following Monday, September 17, 2012, when Scheer returned to Tennessee. Scheer immediately convened an executive management meeting that night to discuss Pittington's claim and begin an investigation. Mace was asked to attend the meeting. In response to questions regarding Pittington's allegations, Mace admitted that he kissed Pittington, but claimed that the kiss was consensual.

The next day, Scheer gave specific instructions to Mace that his movements in the building would be limited. Mace was instructed to enter the building through a side door and not to leave the AV booth except to use the restroom. Scheer further instructed Mace that he was not to speak to any female employees unless it was work related. Scheer also instructed his wife Sheila Scheer (LJF Marketing Manager), Mark Davis (Kitchen Manager), and Mapp to check in with Pittington periodically while she was working to ensure she felt comfortable, secure and safe while the investigation was conducted.

Sheila Scheer conducted interviews relating to the investigation of Pittington's sexual harassment claim. Sheila met with Pittington on September 18, 2012 to take her statement. Pittington stated that on the day of the incident, Mace asked to speak with her in his office. When she entered the office, Mace shut the door and told Pittington that he

4

found her attractive. Mace then rubbed her neck and tried to kiss her. When Pittington pulled away, Mace grabbed her. When she tried to leave, Mace stopped her, apologized and asked her not to say anything. Pittington told Scheer that she should talk to other employees because Mace might be harassing others. LJF continued its investigation by interviewing other employees and obtaining statements. The investigation revealed that Mace had also made inappropriate comments of a sexual nature to other female employees of LJF. As a result of this investigation, on September 23, 2012, Mace was placed on a two-week suspension without pay. LJF subsequently terminated Mace's employment on October 7, 2012.

During LJF's investigation, it became aware of certain inappropriate conduct by Pittington including flirtatious behavior towards male employees and inappropriate sexual comments. David Pittington believed that some of the lumberjacks might be sexually harassing his wife based on a shirtless lumberjack picture he saw on his wife's phone. Rob Scheer conducted interviews with the lumberjacks at the request of David Pittington. LJF was told by other employees that Pittington herself had sent suggestive photos of herself to some of the lumberjacks. Specifically, one picture showed Pittington wearing only a shirt unbuttoned to expose her bra and panties. Other pictures showed Pittington wearing a yellow bikini, including one picture in which one side of the bikini top was pulled down to expose her breast. Pittington denied sending these pictures to the lumberjacks, but admitted that the pictures were on her cell phone. Pittington stated that someone else must have sent the pictures from her phone.

5

Derek Knutson, Road Show Manager, stated that Pittington was very flirtatious with the lumberjacks. He saw a photo of Pittington in her underwear and just a ranger shirt from Tom Lancaster's phone. Knutson further stated that Pittington was very flirtatious with Lancaster, constantly asking him to go for a drink. Audie Veness worked in the arena and stated that Pittington was a flirtatious woman, who made statements of a sexual nature to him and other employees. One such instance, Veness asked Pittington if the hot dogs were hot (hot dogs are frozen when placed on the rotating cooker), she responded "They are hot and hard, just the way I like them." Veness was offended by the remark.

Tom Lancaster, a lumberjack, told LJF that Pittington asked for his phone number and a picture of him. He sent the photo and she sent him a photo of her wearing an unbuttoned shirt, exposing her bra and panties. He further stated that Pittington offered to stop over after work to join him in his hot tub. Lancaster also stated that Pittington flirted with the majority of the lumberjacks. Deanna Gann, arena server, stated that Pittington flirted with most of the men at LJF.

Dwayne Strickland, another lumberjack, stated that Pittington was very flirtatious with him. She offered him a ride and drove off the property and kissed him in the car. Pittington sent him pictures of herself in a yellow bikini. She sent another photo of herself in the same bikini with one side of the bathing suit pulled down revealing her breast. Another time the crotch of Strickland's pants ripped, Pittington grabbed hold of the rip and said "I can sew that for you." He told her he could handle it himself.

6

Scheer testified that some of the lumberjacks, and others working in the arena felt uncomfortable with Pittington's behavior. Scheer further stated that talk about Pittington and her husband was becoming a distraction and disrupting the business of LJF.

On September 27, 2012, LJF offered Pittington a transfer from the arena to the box office at her same rate of pay and same preferred shift hours. LJF told Pittington she would receive training on the operations of the box office with the intent for her to eventually move into a management position. Additionally, Pittington would continue her duties as the assistant arena manager on Mapp's days off. Pittington accepted the offer and began working in the box office on September 28, 2012.

LJF prepared a written warning dated October 8, 2012, finding Pittington had engaged in inappropriate and distracting conduct at the workplace that was separate from the allegations related to Mace. LJF intended to present the warning to her when she reported for her shift. However, Pittington did not report for her scheduled shift. Pittington could not reach her supervisor, Mapp, so she left a message with a box office employee that she had a sick child and would not be reporting for work.[1]

LJF's Employee Manual provides that if an employee is going to be late or absent for any reason, she must telephone her manager at least twelve hours in advance of her starting time unless it is an emergency. It is the employee's responsibility to ensure that proper notification is given. Employees are required to give notice directly to a manager.

---

[1] Her husband, David, was terminated by LJF on October 8, 2012, for insubordination to his supervisor, Mapp.

The next day, October 9, 2012, Pittington contacted Mike Downs approximately 45 minutes prior to her scheduled shift to say that she would be late for work. Downs transferred the call to Mapp, her immediate supervisor, who told her that she should try to make it in on time. Pittington told Mapp that she had been told by her husband that she had been fired. Mapp told Pittington that she had not been fired, and Pittington agreed to report for her shift at 4:00. Subsequently, Mapp made arrangements to cover Pittington's shift that day. Mapp attempted to contact Pittington to let her know that she did not need to report to work, however, the cell number he had for Pittington was incorrect. Mapp then asked another employee to contact Pittington and let her know that she did not need to report to work that day. Pittington did not report for work on October 9, so Mapp assumed that she received the message.

On October 10, 2012, Pittington reported for her scheduled shift. She met with Mapp and Sheila Scheer. During this meeting, she received a written warning for failing to follow company policy on calling in when absent on October 8, and for late notification to her supervisor on October 9. Pittington was also informed that in light of the information regarding her behavior in the arena she was going to work exclusively in the box office and not in the arena as assistant arena manager. Both Mapp and Scheer told Pittington that she was not terminated and that she was to get information regarding her employment status only from her supervisor. Mapp praised Pittington for her work and expressed the company's desire for her to continue her employment. Pittington did not report for work after October 10, and LJF considered her to have voluntarily ended her employment.

8

## III. Standard for Summary Judgment

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Cattrett,* 477 U.S. 317, 330 n. 2 (1986). All facts and inferences to be drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd v. Zenigh Radio Corp.,* 475 U.S. 574, 587 (1986). Courts may not resolve genuine disputes of fact in favor of the movant. *Tolan v. Cotton,* 134 S.Ct. 1861, 1863 (2014) (vacating lower court's grant of summary judgment for "failing to adhere to the axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. *Celotex,* 477 U.S. at 317. To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record upon which a reasonable trier of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper

9

question for the factfinder. *Id.* at 250. The court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the court search the record "to establish that it is bereft of a genuine issue of fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250.

## IV. Analysis

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show: (1) that she engaged in activity protected by Title VII; (2) that this exercise of protected rights was known to the defendant; (3) that the defendant thereafter took adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action. *Hafford v. Seidner,* 183 F.3d 506, 515 (6th Cir. 1999). A causal connection is established when a plaintiff proffers "evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Fuhr v. Hazel Park Sch. Dis.,* 710 F.3d 668, 675 (6th Cir. 2013). Claims under the THRA are analyzed in the same manner as those under Title VII. *Campbell v. Florida Steel Corp.,* 919 S.W.2d 16, 31 (Tenn. 1996).

If plaintiff's *prima facie* burden is met, the burden of production then shifts to defendant "to articulate a legitimate, non-retaliatory explanation for the action." *Morris v. Oldham Cnty Fiscal Ct.,* 201 F.3d 784, 793 (6th Cir. 2000). The burden of production then shifts back to plaintiff to demonstrate that defendant's proffered explanation is

pretextual, either by showing that it has no basis in fact, did not actually motivate defendant's conduct, or was insufficient to warrant the conduct. *Manzer v. Diamond Shamrock Chem. Co.,* 29 F.3d 1078, 1084 (6th Cir. 1984). Plaintiff retains the "ultimate burden of producing sufficient evidence from which the jury could reasonably reject defendant's explanation and infer that defendant intentionally retaliated against plaintiff. *Morris v. Dep't of Veterans Affairs,* 597 Fed. Appx. 861, 865 (6th Cir. 2015). Plaintiff must also demonstrate that the desire to retaliate was the "but for" cause of the challenged employment action. *Univ. of Texas Sw. Med. Ctr. v. Nassar,* 133 S.Ct. 2517, 2528 (2013). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action of the employer. *Id.* at 2533.

LJF concedes that Pittington's report of sexual harassment is protected activity under Title VII and the THRA, and that LJF was aware of Pittington's sexual harassment claim. However, LJF argues there was no adverse action taken against Pittington, and LJF has articulated a legitimate, non-retaliatory reason for its actions.

Pittington argues that her transfer from the arena to the box office was a demotion; that she was stripped of her managerial duties; and that she was terminated or constructively discharged by LJF.

**A. Transfer to the Box Office was not a Demotion**

Pittington argues that her transfer to the box office was not a lateral transfer but LJF's attempt to remove her from any management duties and ban her from the arena, which resulted in her occupying a less distinguished title and performing significantly diminished material responsibilities. Pittington states that LJF placed her in the box

11

office answering phones and taking reservations, which required no actual managerial training.

The record shows that when Pittington was transferred to the box office, she worked the same number of hours at the same rate of pay. Pittington only worked five days in the box office before her employment ended on October 10, 2012. Rob Scheer testified there would probably be 30 days or more of training before she could assume the role of being a manager. Pittington's argument that she did not receive management training during her five days in the box office is unpersuasive given the short amount of time she worked in the box office and ignores the fact that she voluntarily terminated her employment before she could receive any training. The employee has "an obligation not to assume the worst, and not to jump to conclusions too fast." *Wilson v. Firestone Tire & Rubber Co.,* 932 F.2d 510, 515 (6th Cir. 1991).

Pittington asserts that she suffered a "substantial reduction in pay" when she was transferred to the box office because she was not able to work as assistant arena manager for which she received $11.50 per hour. Pittington's hourly rate when not acting as assistant arena manager was $11.00 per hour. She retained this hourly rate when she transferred to the box office. Therefore, any reduction in her pay would be based on this 50¢ difference in her hourly rate. Pittington's time cards show that after she transferred to the box office, she worked 36 hours and 26 minutes. At her hourly rate of $11.00, she earned $401.50. Had Pittington received $11.50 per hour for this time, she would have earned $419.75, for a difference of $18.25. This can hardly be seen as a "significant" reduction in her pay. *See Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th

12

Cir. 1994) (changes in working conditions that cause no materially significant disadvantage are insufficient to establish the adverse condition required).

## B. Removal of Managerial Duties

The record also shows that when Pittington was first transferred to the box office on September 27, 2012, it was intended that she continue acting as the assistant arena manager on Mapp's days off. The record further shows that these duties were later removed from Pittington because of her unprofessional and inappropriate conduct with co-workers in the arena area which created an awkward working environment. LJF's decision was reasonable based on the information LJF received about Pittington's behavior in the arena. *See Anthony v. BTR Auto Sealing Sys.,* 339 F.3d 506, 516 (6th Cir. 2003) (noting that employee must provide specific evidence to prove that an employer's reason for adverse employment action was not factually based or was not the real reason for the decision). LJF believed that Pittington had behaved inappropriately with co-workers in the arena area. When assessing an employer's adverse employment action, "the key inquiry is whether the employer made a reasonably informed and considered decision before taking it." *Smith v. Chrysler,* 155 F.3d 799, 807 (6th Cir. 1998). LJF satisfies this standard. Pittington is unable to establish that LJF's reasons for removing her as assistant arena manager are a pretext for retaliation. "Mere personal beliefs, conjecture and speculation are insufficient to support an inference of [retaliation]." *Chappell v. GTE Prods. Corp.,* 803 F.2d 261, 168 (6th Cir. 1986).

13

## C. Pittington was not Fired by LJF

The record also shows that when Pittington talked with Mapp on October 9, 2012, she was told that despite what she had been told by her husband, she had not been fired. Pittington reported for her scheduled shift the next day, October 10, 2012, and met with Mapp and Scheer. During the meeting, Pittington received a written warning for failing to follow company policy on calling in when absent on October 8 and for late notification to her supervisor on October 9. She was also informed that because of the reports of inappropriate behavior, she was going to work exclusively in the box office and not in the arena as assistant arena manager. Both Mapp and Scheer told Pittington that she was not terminated and that she was to get information regarding her employment status only from her supervisor. Mapp praised Pittington for her work and expressed LJF's desire for her to continue her employment and train for a management position. Pittington was scheduled to work through at least October 16, 2012, but she never returned to LJF. Pittington has presented no evidence to support her argument that she was fired by LJF.

## D. Pittington was not Constructively Discharged

Pittington claims she was constructively discharged because LJF began a retaliatory investigation into her actions; her husband had been demoted and later terminated; and LJF implemented harsher disciplinary action against her as compared to her co-workers.

It is Pittington's burden to prove constructive discharge by showing that LJF deliberately created intolerable working conditions, as perceived by a reasonable person, and did so with the intention of forcing her to quit. *Logan v. Denny's Inc.,* 259 F.3d 558,

14

568-69 (6th Cir. 2001). A constructive discharge requires a determination that "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Ross v. Pfzer Inc.,* 375 Fed. Appx. 450, 457 (6th Cir. 2010). Factors the court considers in determining whether such "intolerable working conditions" exist include the presence of the following: demotion; reduction in salary; reduced job responsibilities; reassignment to menial or degrading work; reassignment to work under a younger supervisor; badgering, harassment or humiliation by the employer calculated to encourage the employee's resignation; offers of early retirement; or continued employment on terms less favorable than the employee's former status. *Logan*, 259 F.3d at 569. A finding of constructive discharge also requires the court to look at both the "objective feelings of the employee, and the intent of the employer." *Kinamore v. EPB. Elec. Util.,* 92 Fed. Appx. 197, 204-05 (6th Cir. 2004). An employer's intent can be shown by demonstrating that the employee quitting was a foreseeable consequence of the employer's action. *Id.* at 205.

Pittington fails to demonstrate the necessary elements for constructive discharge. She has presented no proof of intolerable working conditions deliberately created by LJF nor has she shown that any such conditions were imposed with the intention to force her to quit. Rather, the record shows that Pittington was not constructively discharged, but voluntarily and without notice or explanation failed to report for any scheduled shifts after October 10, 2012. Abandonment of employment does not rise to the level of a constructive discharge unless it is objectively reasonable for the employee to leave under the circumstances. *Mynatt v. Morrison Mgt. Specialist Inc.,* 2014 WL 619601 at *9

15

(E.D.Tenn. Feb. 18, 2014).

There is no evidence in the record to support a finding that circumstances existed such that it was "objectively reasonable" for Pittington to terminate her employment with LJF. The fact that Pittington received a written warning regarding failure to follow company procedures and was counseled regarding inappropriate conduct in the workplace is insufficient to establish constructive discharge. *See Kinamore,* 92 Fed. Appx. at 205) (plaintiff's three-day suspension was insufficient to compel her resignation).

During the meeting with Mapp and Scheer on October 10, 2012, Mapp expressed his desire for Pittington to continue employment with LJF. Mapp stated that he wished for things to "go back to where we were a week ago. You come in, you do your job, you do a great job, you take care of customers. So I feel like you're a good employee and I just want to continue that. Don't want anything to change as far as you coming to work, doing your job. And we just go from here and this is over." Pittington gave no indication at the meeting that she did not intend to continue her employment, instead, she returned to her position in the box office after the meeting and worked the rest of her shift.

Pittington is unable to refute LJF's evidence that she was transferred to the box office to continue her employment, and to receive training in a new department with the intention of ultimately moving into a managerial role. "An employee who quits without giving the employer a reasonable chance to work out a problem has not been constructively discharged." *Summit v. S-B Power Tool,* 121 F.3d 416, 421 (8th Cir. 1997).

16

**E. LJF has Established a Legitimate Non-Retaliatory Reason for its Actions**

Pittington argues that because LJF's investigation into her actions was retaliatory, LJF cannot rely on the investigation as a reason for the adverse actions taken against her. Pittington felt that she could still work productively in the arena. Pittington further argues that it was LJF's investigation, not her actions, that created a working environment in the arena that LJF did not like, so LJF retaliated against her for filing the sexual harassment complaint. Pittington's argument is circular and unpersuasive.

There is no dispute that LJF investigated Pittington's sexual harassment claim and came to the conclusion that Mace acted inappropriately, not only with Pittington but with other female employees as well. It is also undisputed that Pittington and her husband asked LJF to speak to other employees in the arena regarding harassment of other employees by Mace and alleged harassment of Pittington by the lumberjacks. Once LJF learned of the allegations of Pittington's inappropriate behavior from these other employees, it was obligated to investigate. This does not prove that LJF's investigation of Pittington's alleged misconduct was retaliatory. *See Driggers v. City of Owensboro, Ky.,* 110 Fed. Appx. 499, 508 (6th Cir. 2004) (holding that employer's actions in investigating allegations of misconduct of plaintiff who made sexual harassment claim did not amount to an adverse employment action).

The record shows that Pittington was transferred to the box office not in retaliation for bringing a sexual harassment claim, but in response to allegations made by her co-workers regarding her unprofessional behavior in the arena. Just as LJF was required to investigate and respond to Pittington's allegations regarding the conduct of Rich Mace,

17

LJF was also required to investigate and respond to allegations regarding Pittington's inappropriate conduct. LJF's initial decision to transfer Pittington to the box office at the same rate of pay and the same preferred hours while continuing to have her act as assistant arena manager when needed was reasonable given the circumstances. After Pittington's transfer to the box office, LJF learned of allegations that she had sent suggestive photos of herself to some of the lumberjacks. The lumberjacks and other employees in the arena expressed that they were uncomfortable working with Pittington. Additionally, it was becoming a disruption in the workplace. LJF then made the decision to remove Pittington from the arena on October 8, 2012, and notified her of the decision on October 10, 2012. In light of these additional allegations, LJF's decision to remove Pittington from the arena was reasonable. Pittington fails to present sufficient evidence, even when viewed in her favor, which would discredit or outweigh LJF's legitimate, nondiscriminatory reasons for its actions.

## V. Pittington's Motion to Strike

Pittington objects and moves to strike portions of exhibits to LJF's motion for summary judgment: (1) Affidavit of Enchantee Mace; (2) Affidavit of Rob Scheer; (3) Affidavit of Deanna Gann; (4) Affidavit of Jay Rumple; (5) Affidavit of Kris Jackson; (6) Affidavit of Matt Samler; and (7) Affidavit of Zach Stevens [R. 18].

The court considered only one statement from the Affidavit of Deanna Gann. Gann was an arena server and had occasion to witness Pittington's interactions with employees in the arena. As noted above, Gann stated that Pittington flirted with most of the men at LJF. As Gann was speaking of her observations in the arena, any objection by

18

Case 3:14-cv-00466-PLR-CCS   Document 33   Filed 09/29/16   Page 18 of 19   PageID #: 1314

Pittington is overruled. The remainder of the Gann Affidavit has not been considered by the court in its ruling on the motion for summary judgment.

Regarding the objection to Rob Scheer's Affidavit, defendant states it relies only on paragraph 8 regarding Scheer's interview with Rich Mace. The court accepts the statement that "Rich Mace confessed that he had kissed Mrs. Pittington in his office." The other statements in paragraph 8 are not material to the court's analysis herein and Pittington's objection to the one quoted statement is overruled.

The Affidavits of Enchantee Mace, Jay Rumple, Kris Jackson, Matt Samler, and Zach Stevens are not material to the court's analysis. Therefore, Pittington's objection and motion to strike is **DENIED.**

### VI. Conclusion

In light of the foregoing discussion, LJF's motion for summary judgment [R. 13] is **GRANTED;** Pittington's motion for summary judgment [R. 15] is **DENIED;** and this action is **DISMISSED** in its entirety.

**IT IS SO ORDERED.**

_____
**UNITED STATES DISTRICT JUDGE**